# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LORRAINE CHAVEZ DAVIS,

     **Plaintiff,**

v.                                                                        **Civ. No. 18-228 KK**

NANCY A. BERRYHILL,
**Acting Commissioner of Social Security,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 19), filed June 21, 2018, in support of Plaintiff Lorraine Chavez Davis' Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying Ms. Davis' claim for Title II disability insurance benefits.  On September 28, 2018, Ms. Davis filed her Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, with Supporting Memorandum.  (Doc. 26.)  The Commissioner filed a Response in opposition on November 8, 2018 (Doc. 27), and Ms. Davis filed a Reply on November 23, 2018 (Doc. 28).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that the Motion is well taken and shall be **GRANTED**.

## I.  Legal Standards

### A.    Standard of Review

This Court must affirm the Commissioner's final decision denying social security benefits unless:  (1)  "substantial evidence" does not support the decision; or, (2) the Administrative Law

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 15.)

Judge ("ALJ") did not apply the correct legal standards in reaching the decision.[2] 42 U.S.C. §§ 405(g), 1383(c); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* Although the Court may not re-weigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the [agency]'s findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Thus, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

---

[2] Judicial review is limited to the Commissioner's final decision, which is generally the ALJ's decision. *Silva v. Colvin*, 203 F. Supp. 3d 1153, 1155 n.1 (D.N.M. 2016). "This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision." *Id.*

## B.    Disability Determination Process

A person must, *inter alia*, be "under a disability" to qualify for disability insurance benefits under Title II.  42 U.S.C. §§ 423(a)(1)(E), 423(d)(1)(A).  An individual is considered to be "under a disability" if she is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

> 42 U.S.C. § 423(d)(1)(A).

The Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies the statutory criteria:

(1)    At step one, the ALJ must determine whether the claimant is engaging in "substantial gainful activity."[3]  If the claimant is engaging in substantial gainful activity, he is not disabled regardless of his medical condition.

(2)    At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment (or combination of impairments) that is severe and meets the duration requirement, he is not disabled.

(3)    At step three, the ALJ must determine whether a claimant's impairment meets or equals in severity one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)    If none of the claimant's impairments meet or equal one of the listings, the ALJ must determine at step four whether the claimant can perform his "past relevant work."  This step involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [claimant] can still do despite [his physical and mental] limitations."    20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC").  *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ must determine the physical and mental demands of the claimant's past work.

---

[3] "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a).  "[W]ork may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.* "Gainful work activity is work activity that you do for pay or profit." 20 C.F.R. §§ 404.1572(b), 416.972(b).

> Third, the ALJ must determine whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is able to perform his past relevant work is not disabled.

> (5)　If the claimant is unable to perform his past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan*, 399 F.3d at 1261. The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

## II. Background and Procedural History

### A.　Factual Background

Ms. Davis alleges that she became disabled at age forty-nine[4] because of psoriatic arthritis, bipolar disorder, anxiety disorder, hypothyroidism, and high blood pressure. (AR. 39, 108, 196, 239.)[5] Ms. Davis earned a bachelor's degree in English, and, in 2001, she entered a master's program in secondary education, which she did not complete because of her psoriasis and psoriatic arthritis. (AR. 24.) She worked as a teacher, as a scorer and reader of standardized exams, as a group facilitator, as a case manager, and as an exam proctor. (AR. 24-32.) Ms.

---

[4] Ms. Davis originally claimed to have become disabled on January 1, 2009, but at her administrative hearing she amended the alleged onset date to July 1, 2012.

[5] Citations to "AR" are to the transcript of the administrative record filed in this matter on June 21, 2018. (Doc. 19.)

Davis reported that she stopped working on October 24, 2013, because of her conditions. (AR. 239.)

## 1. Medical History and Relevant Medical Evidence[6]

### a. Medicine Downtown Dr. Unverzagt 2008-2015

The record reflects that Ms. Davis received primary care treatment with physician Dr. Mark Unverzagt at Medicine Downtown from January 2008 through August of 2014. (AR. 349, 1344.) Treatment notes from 2008 reflect that Dr. Unverzagt saw Ms. Davis at least eight times for her bipolar disorder with depression and for arthritis. (AR. 349-63.) Dr. Unverzagt's notes reflect that in 2008 Ms. Davis was at times depressed and angry, experienced suicidal ideation but without an active suicide plan, had loss of motivation, feelings of agoraphobia and obsessive compulsive behaviors, and experienced adverse side effects of lithium. (AR 356-61.) Dr. Unverzagt saw Ms. Davis at least three times in 2009 and she was reportedly stable and doing well on lithium without side effects. (AR. 366-370.)

By January 2010, however, Ms. Davis reported that she had been depressed for a month, and had symptoms of sadness, anhedonia, disturbed sleep, extreme nervousness and/or worry, was quick to express or feel anger, and was socially isolating; Dr. Unverzagt referred her to counseling. (AR. 371.) She was feeling "the same" in February 2010, and she had disturbed sleep, and difficulty concentrating and/or completing tasks though she was taking medication as prescribed. (AR. 372.) Ms. Davis treated with Dr. Unverzagt three additional times in 2010 and three times in 2011 and she was by and large compliant with her lithium and doing well overall. (AR. 374-79, 381, 389, 444.) After reportedly being stable on lithium in January and June 2012 (AR 390, 392), by September 2012, Ms. Davis was lacking in motivation and Dr. Unverzagt noted that she was

---

[6] Ms. Davis' medical, psychiatric, and counseling records are voluminous. The following summary presents an extensive, but not exhaustive, overview of Ms. Davis' relevant treatment history.

positive for depression and mania. (AR. 394.) And in December 2012, Ms. Davis reported that she was doing fine overall, denied an exacerbation in depression, and reportedly felt well. (AR. 398.) Ms. Davis saw Dr. Unverzagt one time in September 2013 complaining about physical problems. (AR. 401.)

In April 2014, Ms. Davis reported "doing well" with regard to her chronic health problems and although reportedly under a lot of stress, denied significant mania or depression. (AR. 509.) By August 2014 however, her depression had worsened and she reported having suicidal thoughts and staying in bed for stretches of a couple of days at a time. (AR 1346.) During visits in September 2014, she reported feeling malaise, (AR. 1344), but later in the month she had gotten a job and felt her depression was "better." (AR 1337.) In October 2014, Ms. Davis was "becoming a bit manic," but she was not suffering depression. (Doc. 1334.) In November 2014, Ms. Davis was feeling "more depressed," she reported being in "mental pain" and having suicidal thoughts, and since she was back on lithium, her manic symptoms had decreased. (Doc. 1332.) On December 3, 2014, Ms. Davis saw Dr. Unverzagt as a follow up after being hospitalized in the UNM psychiatric ward, during which time her psychiatric medications were discontinued and she was treated with Electroconvulsive therapy (ECT). (Doc. 1330.) During this visit, she reported night terrors, dread, and feeling terrible; she also reported increased insomnia, a recurrence of depression, having suicidal thoughts, and being angry all the time. (Doc. 1330.) At a December 18, 2014 visit although not assessed to be in crisis and denying depression, Ms. Davis was documented as manic; refusing to take lithium; having undergone five ECT treatments and refused to have any more; had been experiencing intermittent suicidal and homicidal ideation; she denied being depressed; angry about her mental-health treatment options. (AR. 1328-29.) On December 23, 2014, Ms. Davis reported that she was doing much better on Depakote, she had much less

mania and emotional lability, and she was sleeping soundly; she also reported "a lot of anxiety"; and Dr. Unverzagt noted that he did not want her to use prescribed controlled substances because she might be abusing them. (AR 1326-27.) On December 31, 2014, Ms. Davis exhibited some mania, emotional lability, and anger toward her parents. (AR. 1325.) Dr. Unverzagt refused Ms. Davis' request for pain medication and advised her that her family had reported that she was taking pain medication inappropriately (which she denied doing). (AR. 1324.) Dr. Unverzagt noted that Ms. Davis had paged him in the middle of the night the previous week complaining of severe pain and that some of her rationales for treatment were inappropriate. (AR. 1324-25.)

In January 2015, Ms. Davis reported to Dr. Unverzagt that she had pain everywhere all of the time; she denied mania, but reported some depression with fatigue. (AR. 1320.) In February 2015, during a routine follow-up she reported intermittent use of Adderall and that she was experiencing anger problems and contributing "personality issues at work." (AR. 1315.) In April 2015, Ms. Davis reported that she was doing very well on new medications prescribed by UNMH psychiatry clinic, she felt less manic and a lot less depression, but she did not have a regular sleep pattern. (AR. 1312.) In July 2015, she reported her belief that she might have narcolepsy because she would suddenly "get weak all over and have to . . . take a nap" (a circumstance that Dr. Unverzagt attributed to medication side effects, and was doubtful as to narcolepsy); she reported the use of Adderall to help with this condition. (Doc. 1310.) In September 2015, Dr. Unverzagt noted that Ms. Davis was off medication but "holding her own" and that she had slightly pressured speech. (AR. 1304.) In November 2015, during a routine wellness care appointment, in addition to discussing physical problems, Ms. Davis reported regarding her mental health that she had been off her medication for two months, that her mood had been stable, and that her current psychiatrist said that she is not bipolar, but she may have borderline personality disorder. (AR 1297.)

**b. Dr. Pierce 2015-2016**

In September 2015, on referral from Dr. Unverzagt, Ms. Davis began seeing Dr. Surya Pierce to evaluate and treat her psoriatic arthritis, psoriasis, bipolar disorder, chronic pain, and steatohepatitis. (AR 910.) Ms. Davis reported to Dr. Pierce that since January 2015, she had significant chronic pain and associated distress. (AR. 910.) She also reported that she had daily chronic pain that waxed and waned since 1990, when she was diagnosed with fibromyalgia. (AR. 910.) She reported, also that the pain interferes with all aspects of her life and it was complicated by "significant psoriasis and psoriatic arthritis[,]" and although biologic agents "helped tremendously" with the arthritis, her myofascial pain persists. (AR. 910.) Ms. Davis also reported to Dr. Pierce that she was "variably disabled by her chronic pain and mental health issues." (AR. 911.) Among other things, Dr. Pierce noted that Ms. Davis' bipolar disorder was poorly controlled and assessed her as having "significant mental health problems in the last year due to poorly controlled bipolar illness." (AR. 913-14.) Ms. Davis saw Dr. Pierce again five days later, and he noted that she had pressured speech, was tearful at times, insisted that she was anxious and appeared to be showing signs of uncontrolled bipolar illness, and may have somatization related to this. (AR. 908-09.) In September 2015, Ms. Davis reported to Dr. Pierce that she had a recurrence of her chronic and diffuse myofascial pain, and ongoing pain in her lower pelvis. (AR. 902.) Dr. Pierce noted that she was "tearful at times" and that she endorsed "some possible somatizations of her moods in physical form." (AR. 902.) In March 2016, Dr. Pierce noted that Ms. Davis' mood was good, and her fibromyalgia pain had improved with medical marijuana. (AR. 1375-76.) In April 2016, Dr. Pierce noted that Ms. Davis was anxious, with pressured, somewhat rambling, and anxious speech and pain all over her trunk, which was improved by use of medical marijuana. (AR. 1373-74.) In May 2016, Ms. Davis saw Dr. Pierce to follow up

regarding recent emergency room visits for diverticulitis, and dizziness, and also reported that she was certain that she did not have bipolar disorder. (AR. 1370-71.)

### c.  Psychological Evaluation 2014

The New Mexico Disability Determination Services Office referred Ms. Davis to Thomas Dhanens, Ph.D, for a psychological evaluation in February 2014. (AR. 413.) Dr. Dhanens diagnosed Ms. Davis with bipolar disorder in partial remission with medication. (AR. 417.) As to "vocational implications" Dr. Dhanens noted the following:

> The claimant is currently employed. Anything beyond this is speculative. (i.e., Whether she will be able to hold the job? If she loses it, will it be due to Bipolar disorder? Could she possibly work full time?) It would depend on situational stresses, medications, working conditions, motivation, etc. This generality might apply to anyone. But, I believe she is at risk of behaving inappropriately on the job if stressed. Even if mood swings are stabilized, there is still an underlying characterological component. She is judgmental, and challenges perceived 'injustice' whether medicated or not; this is eco-syntonic. She said she gets irritated with the testing candidates she works with, but has been able to mask her feelings, with medication.

(AR. 417.)

### d.  UNMH Psychiatric Hospitalization 2014

On November 4, 2014, Ms. Davis was admitted to the hospital because she was actively suicidal. (AR. 683.) Notes from the behavioral health adult psychiatric interview indicate that Ms. Davis' grown children told her providers that her depression had worsened over the past year due to medical problems and interpersonal stress. (Doc. 686.) Ms. Davis also reported that her mood had worsened over the past year, that she had increasingly frequent thoughts of death for the past two months that had worsened over the previous two days. (Id.) On November 6, 2014 Ms. Davis was transferred to an inpatient psychiatric center at the University of New Mexico Hospital (UNMH) where she received treatment through November 14, 2014, for irritability, suicidal ideation, depressed mood, pressured speech, insomnia, poor appetite, and feelings of guilt. (AR

629, 1042-43.)   Records from this time frame reflect that Ms. Davis had told various medical providers different stories regarding her suicidal ideation—she told an emergency room provider that she had picked out a rope at a tractor supply store, and had identified some trees from which to hang herself, she told a University Hospital provider that she was actively suicidal, but she did not have a plan, and records from the inpatient psychiatric center reflect that Ms. Davis was admitted to the hospital because she had sent her sister a text message asking what dosage of medication could kill her.  (AR. 683, 1043.)   During her inpatient treatment period, Ms. Davis received four ECT treatments, and the treatment notes indicate that she was improving as a result of the ECT.  (AR. 1030, 1047.)  She also received behavioral health therapy.  (AR 1030.)  By the time she was discharged, Ms. Davis did not demonstrate any features of depression, she was stable, she denied suicidal or homicidal ideation or auditory verbal hallucinations, and she attended appropriately to her activities of daily living.  (AR. 1047.)   Upon admittance, Ms. Davis' GAF was assessed to be 25, and at discharge her GAF was assessed at 57.[7]  (1042.)

### e.  Other Mental Health Treatment

Ms. Davis participated in individual and group therapy consistently from August 2014 through September 2016.  (AR. 530, 801-14, 964, 967, 973, 982-85, 987-1025, 1220-31, 1432-47.)  To the extent that they inform the Court's analysis, treatment notes from these counseling sessions are discussed later in this Opinion.

### f.  Other Psychiatric Treatment

---

[7] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job).  *Id.* at 34.

In January 2015, Ms. Davis began psychiatric treatment with Dr. Edwin Hall. (AR. 825.) Dr. Hall screened Ms. Davis for common DSM IV diagnoses, and found her to have significant symptoms of depression, generalized anxiety disorder, panic disorder, social anxiety disorder, obsessive-compulsive disorder, PTSD, bipolar disorder, ADHD, and personality disorder. (AR 825.) Dr. Hall noted that Ms. Davis reported having thoughts of wanting to die or of killing herself many times each day. (AR. 828.) Dr. Hall assessed Ms. Davis to have a GAF of 50. (AR. 829.) Ms. Davis saw Dr. Hall again in February 2015, and she reported no thoughts of suicide (AR. 820, 822), and again in May 2015 (AR. 816), when Ms. Davis was experiencing sleep issues (AR 818); at these visits, Dr. Hall continued to assess Ms. Davis' GAF as 50. (AR. 817, 821.) In the interim, in March 2015, Ms. Davis saw Dr. Erin Tansey, reporting to her that she and Dr. Hall did not want to continue their treating relationship. (AR. 967.) Dr. Tansey assessed Ms. Davis to have a GAF of 50, and diagnosed her with borderline personality disorder. (AR 967.) Ms. Davis' "chief complaint," as noted by Dr. Tansey, was that she had "mood disorders that sometimes manifest with physical issues." (AR 967.) Ms. Davis reported to Dr. Tansey that she had suicidal thoughts all her life, but did not presently have such thoughts, nor did she have any suicidal intent or plan. (AR 968.) In her mental status examination notes, Dr. Tansey described Ms. Davis as "very irritable[,] . . . angry and yelling intermittently during the interview" with an affect that ranged from joking to hostile. (AR 970.)

In September 2015, Ms. Davis saw Dr. Sammie Lamont Moss for psychiatric treatment. (AR 1032.) Dr. Moss diagnosed Ms. Davis with borderline personality disorder, with a GAF of 50, and noted the following medical conditions: nonalcoholic steatohepatitis, hypothyroidism, GERD, fibromyalgia, psoriatic arthritis, hypertension, and hyperlipidemias. (AR. 1032.) Ms. Davis reported to Dr. Moss that she was mentally stable, but that her medical conditions made

"everything difficult for her." (AR. 1032-33.) Ms. Davis particularly complained that her fibromyalgia had become a bigger issue, she has pain that is "very bad," and she was in constant discomfort due to psoriatic arthritis. (AR. 1033.) Ms. Davis also reported that she had experienced insomnia for the past year, and that her pain and insomnia were such that she would not be able to continue work as a test administrator. (AR 1033.) Dr. Lamont noted that Ms. Davis was "easily incensed, comfortable, making negative, biting statements toward others," and that, the "central theme" of her thought content was "being offended by others quite easily." (AR. 1035.) Dr. Lamont noted that Ms. Davis presented "with a self-described diagnosis of bipolar affective disorder, but upon further examination it is quite obvious that [she has] borderline personality disorder." (AR. 1035.) Ms. Davis saw Dr. Moss again in October 2015, and Ms. Davis reported that she had stopped taking medication. (AR. 1237.) Ms. Davis reported that she was getting 5-6 hours of sleep each night but did not feel rested afterward, she had chronic feelings of guilt or worthlessness, and she reported feeling anxious often but that she was finding ways to work with it through therapy. (AR. 1237.) Dr Moss noted that Ms. Davis' presentation was "consistent with borderline personality disorder" and although Ms. Davis was "uncomfortable with this diagnosis," she agreed that her symptoms were consistent with the diagnosis. (AR. 1240.) Ms. Davis reported that she was not interested in any new medication. (AR. 1240.) Dr. Moss assessed Ms. Davis' GAF to be 49. (AR. 1237.) Dr. Moss discharged Ms. Davis in February 2016 because she refused medications. (AR. 1472-73.) Ms. Davis' GAF at that time was 49. (AR. 1473.)

### g. The State Agency Consultants

On January 19, 2014, consultative examiner Dr. Eileen Brady assessed Ms. Davis' physical residual functional capacity based on an examination of Ms. Davis' medical records ranging from January 2008 through September 2013. (AR. 82-83.) Dr. Brady assessed Ms. Davis as being

capable of "medium work" with frequent postural limitations, and certain environmental limitations. (AR. 80-82) *See* 20 C.F.R. § 404.1567(c) (defining medium work as involving lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds). Dr. John Pataki, another examiner reached the same conclusions on September 19, 2014. (AR. 95-98.)

On February 24, 2014, consultative examiner Dr. Elizabeth Chiang evaluated some of Ms. Davis' medical records ranging from January 2008 through December 2012, as well as Dr. Dhanens' psychological evaluation. (AR. 85.) Dr. Chiang concluded that Ms. Davis "can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a work setting." (AR. 86.) Upon review of the records, Dr. Paul Cherry reached the same conclusion on September 17, 2014. (AR 100-01.)

## B. Procedural History

On December 3, 2013, Ms. Davis filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. (AR. 74.) The agency denied Ms. Davis' applications at the initial level and upon reconsideration on February 25, 2014 and September 22, 2014, respectively. (AR. 75-108, 89-103.) On November 24, 2014, Ms. Davis requested a hearing before an Administrative Law Judge (ALJ). (AR. 140.) ALJ Doug Gabbard, II conducted a hearing on October 19, 2016. (AR. 14-72.) Ms. Davis appeared in person at the hearing with her Attorney, Michael Hacker (AR. 6, 14.) The ALJ took testimony from Ms. Davis (AR. 16-69), and from an impartial vocational expert (VE), Bonnie Ward (AR. 16, 69-72.) On December 22, 2016, the ALJ issued an unfavorable decision. (AR. 108-18.) On

January 19, 2018, the Appeals Council denied Ms. Davis' request for review, rendering the ALJ's decision the final decision of the Commissioner from which she now appeals. (AR. 1.)

### C.    The ALJ's Decision

The ALJ determined at step one of the sequential evaluation process that Ms. Davis met the insured status requirements through June 30, 2019, and that she had not engaged in substantial gainful activity since the alleged onset date of July 1, 2012.  (AR. 110.)  At step two, the ALJ found that Ms. Davis has the severe impairments of inflammatory/psoriatic arthritis, anxiety, affective disorder, and borderline personality disorder.  (AR. 110.)  The ALJ also found that she has the non-severe impairments of hypertension, diabetes, fibromyalgia/myofascial pain, gastroesophageal reflux disease (GERD), nonalcoholic steatohepatitis, insomnia, asthma/chronic obstructive pulmonary disease, mild bilateral cataracts, lipoprotein deficiencies, and diverticulitis. (AR. 111.)

The ALJ determined at step three that Ms. Davis' impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, citing, specifically, 20 C.F.R. 404.1520(d), 404.1525, and 4041526.  (AR. 111.)  At step four, the ALJ found that Ms. Davis has the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c),

> except that [Ms. Davis] can perform frequent climbing, stooping, kneeling, crouching and crawling, and unlimited balancing.  She must avoid concentrated exposure to humidity and extreme temperatures.  She is also limited to semi-skilled work (work which requires understanding, remembering and carrying out some detailed skills, but does not require doing more complex work duties). Interpersonal contact with supervisors and coworkers must be incidental to the work involved, but her supervision should be non-critical.  She will do best in a work setting where she can frequently work alone.  She should have only occasional contact with the general public.

(AR. 113). Based on this RFC finding and the testimony of the VE, the ALJ concluded that Ms. Davis is unable to perform past relevant work, but that there are jobs existing in significant numbers in the national economy that she can perform. (AR. 116-18.)

### III. <u>Analysis</u>

In support of her Motion, Ms. Davis argues that (1) the ALJ failed to consider all of her psychological limitations and, therefore, failed to sufficiently restrict her ability to deal with coworkers, supervisors, and the public or to consider whether she can sustain work on a regular and continuing basis (Doc. 26 at 19-23); (2) the ALJ erred in failing to assess a fingering limitation (Doc. 26 at 23-24); (3) the ALJ did not properly weigh her' GAF scores (Doc. 26 at 24); and (4) the ALJ's step five findings were flawed because he did not ask the VE to notify him if her testimony was inconsistent with the DOT, and because the VE did not explain how a person working on an assembly line would be considered to be "frequently working alone." (Doc. 26 at 25-27.) For the reasons discussed below, the Court finds the ALJ's findings regarding Ms. Davis' mental health limitations are not supported by substantial evidence in light of the record as a whole. Because, the Court remands this matter based on the issues raised by Ms. Davis regarding her mental health, the Court does not address Ms. Davis' remaining claims of error.

### 1. <u>The ALJ's Findings Regarding Ms. Davis' Mental Health Are Not Supported by Substantial Evidence in Light of the Record as a Whole</u>

The ALJ accorded "little weight" to Dr. Dhanens' opinion that Ms. Davis is at risk of behaving inappropriately on the job if stressed because even if her mood swings are stabilized, there is an underlying characterological component. (AR. 115-16, 417.) In that regard, the ALJ reasoned that Dr. Dhanens noted that his opinion was "speculative" (specifically, Dr. Dhanens stated that Ms. Davis was "currently employed. Anything beyond this is speculative"), and that his examination of Ms. Davis showed "largely normal functioning in spite of impairments." (AR.

116, 417.)  Ms. Davis argues that because "[a]ny time a psychologist offers an assessment of predicted functioning, it could be deemed 'speculative[,]' the ALJ erred in giving little weight to the opinion on that ground.  (Doc. 26 at 20.)  She also argues that the ALJ erred in finding that Dr. Dhanens' examination of Ms. Davis "showed largely normal functioning [despite] impairments." (AR. 116, Doc. 26 at 20.)  Ms. Davis argues, further, that the ALJ erred in failing to consider the fact that when Dr. Dhanens evaluated Ms. Davis, he was not privy to her diagnoses of borderline personality disorder, to her medical records demonstrating psychiatric hospitalization, and to her subsequent refusal to take psychiatric medication.  (Doc. 26 at 20-21.)

In some regards, Ms. Davis' arguments related to the ALJ's treatment of Dr. Dhanens opinions are unpersuasive.  For example, it was Dr. Dhanens himself, not the ALJ, who described his opinions as speculative. That Dr. Dhanens prefaced his assessment of Ms. Davis' ability to do work related-activities by explaining that his opinions were speculative, constitutes substantial evidence supporting the ALJ's concordant reasoning. *Langley*, 373 F.3d at 1118 (stating that substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion").  Further, although Dr. Dhanens' "mental status" examination notes indicate that Ms. Davis' delayed recall of three words was 2/3; that her "[v]erbal abstraction was inconsistent"; that she had "some difficulty on tasks involving sequencing and sustained attention," she had no difficulty in several other areas.  (AR. 415-16.)

To that end, Dr. Dhanens noted that Ms. Davis was well oriented; she was able to name five recent presidents and five large cities with no difficulty; she was composed; she was not labile; she had a neutral affect; she seemed objective and eager to provide information; her presentation was not melodramatic or histrionic; her thinking was coherent, logical, and goal directed, and not expansive, pressured or scattered; there was no hesitation, blocking or confusion; she had no issues

with immediate recall; and she performed some arithmetic calculations adequately. (AR. 415-16.) Dr. Dhanens' "impression" was that her mood disorder was improved with medication (she was then medicated), and he did not observe anything "very remarkable in terms of her mood, affect, behavior, or thought process." (AR. 416-17.) Thus, with the handful of exceptions noted by Ms. Davis, Dr. Dhanens mental status examination and his impression of Ms. Davis supports the ALJ's conclusion that Ms. Davis showed "largely normal functioning" during her psychological evaluation under the substantial evidence standard. *Langley*, 373 F.3d at 1118.

This notwithstanding, Dr. Dhanens' mental status evaluation of Ms. Davis is but a fraction of the relevant evidence of Ms. Davis' mental health issues, and the ALJ does not appear to have considered Dr. Dhanens' opinion that "without medication [Ms. Davis] likely would appear more openly symptomatic with mood disorder, and secondarily behavior disorder" (A.R. 417)—in the context of the record as a whole. The record in this case is expansive—exceeding fifteen-hundred pages and covering Ms. Davis' medical and mental health issues spanning approximately nine years. During this time frame, among other things, Ms. Davis was variously medicated, unmedicated, and her mental health diagnoses were changed.[8] Against this evidentiary backdrop, the ALJ's findings regarding Ms. Davis' mental health records in terms of her RFC are, essentially, the following:

> [t]he claimant has a history of mental health problems, including inpatient hospitalizations due to suicide attempts and ideations. [She] has also continuously been in counseling, and had [ECT] as an additional mode of treatment. The claimant also has a history of stopping her psychotropic medication. . . . a history of manic behavior, excessive alcohol use, and difficult interactions with a former fiancé that at times exacerbated her functioning.
> . . . .
>
> [Despite this] history . . . *her mental health was largely reported as stable* in the record. In June 2012, shortly before the amended onset date, she had a stable mood

---

[8] At the hearing, Ms. Davis testified that there was no medication for her current diagnosis of borderline personality disorder. (AR. 44.)

> [as she reported to Dr. Unverzagt]. In February 2014, at the consultative
> examination [with Dr. Dhanens], while the claimant endorsed lack of motivation,
> she denied depression, and stated life was going well, and she was stable with
> medication. Her thinking was coherent, logical, and goal oriented. [Dr. Dhanens]
> noted that he did not observe anything remarkable in terms of her mood, affect,
> behavior or thought process.

(AR. 114 (citations omitted) (emphasis added); 392, 413-16.) The ALJ also found that Ms. Davis "appears to do well with treatment, and [despite] her hospitalizations, has done very well overall." (AR. 114) In support of this finding the ALJ cites (1) a treatment note from Ms. Davis' November 4, 2014, admission for inpatient treatment indicating that Ms. Davis was actively suicidal (AR. 114, 683); (2) a treatment note from Dr. Unverzagt from 2014 indicating that Ms. Davis was exhibiting mania (AR. 114, 1325); (3) a treatment note from Dr. Unverzagt in November of 2015 indicating that Ms. Davis was unmedicated, but reported that her mood was "stable" (AR. 114, 1297); (4) a treatment note from Dr. O'Sullivan in September 2015 indicating that Ms. Davis was not currently taking psychotropic medications, but was in intensive cognitive behavioral therapy (AR. 114, 1289); and (5) a single page of counseling records indicating that Ms. Davis and her partner were attending couple therapy in January and February of 2016. (AR. 114, 1496). Viewed in the context of the record as a whole, this is not substantial evidence.

The foregoing few treatment records appear to have been selected by the ALJ because they tend to support a finding of non-disability, while other relevant treatment records from the same time frames which were omitted from the ALJ's analysis, do not. Although the ALJ correctly observed that, in June 2012, (before the alleged onset date) Ms. Davis reported to Dr. Unverzagt that her mood was stable, Dr. Unverzagt's treatment notes from September 2012—three months later, indicate that Ms. Davis was anxious, depressed, and manic. (AR. 396.) Additionally, while the ALJ relied heavily on Dr. Dhanens' February 2014 psychological evaluation to the extent that it indicated Ms. Davis' "normal" mental functioning, there is substantial evidence in the record

that later in 2014, Ms. Davis' mental health issues significantly worsened.  For example, in August 2014, Ms. Davis had worsening depression and would stay in bed for a couple of days at a time (AR. 1346); in September 2014 Ms. Davis' mood was flat, and her depression was "not worse" but she felt malaise (AR. 1344); Ms. Davis was manic in October 2014 (AR. 1334); and in November, Ms. Davis was hospitalized because, among other mental health issues, she was suicidal.  (AR 629, 1042-43.)  Although Ms. Davis' discharge notes reflect that she had improved with inpatient treatment, by the next month she was manic, she was not taking psychotropic medication, and she was experiencing intermittent suicidal and homicidal ideation. (AR. 1328-29.)

Further, although the ALJ notes that in November 2015, Ms. Davis reported to Dr. Unverzagt that her mood was "stable," read in its entire context, the note actually reflects that her "mood has been stable [without suicidal or homicidal ideations or hallucinations] or substance abuse" but Ms. Davis was depressed and anxious.  (AR. 1297, 1299.)  Additionally, Dr. Unverzagt's notes and other treatment notes reflect that during this time frame, Ms. Davis' bipolar diagnosis was in question, and her then-current psychiatrist (Dr. Moss) believed that Ms. Davis might have borderline personality disorder.  (AR. 1237, 1297.)  And, while the ALJ observed that Dr. O'Sullivan—Ms. Davis' rheumatologist—noted in September 2015, that Ms. Davis was not taking psychotropic medication, but she was in therapy, the ALJ did not discuss treatment notes from that same time frame taken by Dr. Moss—Ms. Davis' psychiatrist.  Notably, Dr. Moss's treatment notes from October 2015, for example, indicate that Ms. Davis was anxious, and she was experiencing insomnia, irritability, and agitation.  (AR. 1237-40.)

Finally, aside from the single-page reference to Ms. Davis' couples therapy in January and February of 2016, the ALJ does not appear to have considered Ms. Davis' extensive individual therapy notes from the same approximate time frame.  Therapeutic treatment notes indicate, for

example, that in February 2016, Ms. Davis had accelerated and pressured speech (AR. 1468-69); in one appointment in March 2016, she had accelerated and pressured speech and a tearful affect, and at another appointment that month, her "demeanor resembled mania" (AR. 1458, 1464-65); in June 2016, Ms. Davis was experiencing panic and anxiety, she was unable to complete tasks, she had thoughts of death, and she felt guilty or worthless (AR. 1423); later in June 2016, Ms. Davis reported feeling manic and had been arrested after biting her partner's face and pushing him during a domestic altercation (AR. 1441); and in September 2016 she was struggling to regulate her emotions generally, and her anger "most disturbingly" and was still attempting to get a clear diagnosis surrounding bipolar disorder and borderline personality disorder (AR. 1430, 1434). Ms. Davis' therapy notes reveal, as well, that she was often tardy for or cancelled her appointments last-minute. (AR. 1436, 1438, 1440, 1446, 1463, 1471.)

As indicated by the foregoing discussion, and as set forth in greater detail in the background section of this opinion, the significantly probative evidence of Ms. Davis' mental health issues is vastly more expansive than reflected by the ALJ's reference to five treatment notes and to Dr. Dhanens' February 2014 psychological evaluation. While the ALJ is not required to discuss every piece of evidence, his decision must demonstrate that he considered all relevant evidence— including that which supports, and that which contravenes his decision—and he must discuss the significantly probative evidence that he rejects. *Clifton*, 79 F.3d at 1009-10. Here, the ALJ appears to have based his decision on a small selection of evidence, picked and chosen because it is favorable to a finding of non-disability. At the same time, the ALJ failed to discuss relevant evidence that contravened his conclusory finding that Ms. Davis' mental health was "largely reported as stable." The pick-and-choose approach reflected in the ALJ's decision is impermissible, it does not facilitate review, and it precludes the Court from determining that the

ALJ's decision is supported by substantial evidence. *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (Where an ALJ "barely mention[s] . . . the medical evidence in the record" that is contrary to his decision, but "pick[s] and choose[s] among medical reports, using portions of evidence favorable to his position[,]" his decision is not supported by substantial evidence.); *Clifton*, 79 F.3d at 1009 ("In the absence of ALJ findings supported by specific weighing of the evidence [the Court] cannot assess whether relevant evidence adequately supports the ALJ's" decision.). Accordingly, this case shall be remanded.

As a final matter pertaining to the ALJ's evaluation of her mental health records, Ms. Davis argues that the ALJ erred in weighing her GAF scores. (Doc. 26 at 24.) In regard to Ms. Davis' GAF, the ALJ reasoned that

> [t]hroughout the record, [Ms. Davis] is assigned Global Assessment of Functioning ("GAF") scores by her clinicians. . . . [T]hese GAF scores [are accorded] little weight because they represent the clinician's subjective evaluation at a single point in time and not the claimant's overall limitations in functioning. Furthermore, [a] GAF score may also indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone, without further explanation, the scores do not evidence an impairment that interferes with [Ms. Davis'] ability to perform basic work functions.

(AR. 116 (citations omitted).) Ms. Davis argues, and the Court agrees, that "[f]ar from standing alone, [her] GAF scores are accompanied by supporting evidence in the form of hundreds of pages of mental status examination findings" pertaining to Ms. Davis' functioning. (Doc. 26 at 24.) Throughout the record, Ms. Davis' GAF was consistently assessed at 50 or less,[9] indicating "serious symptoms or serious impairment in social [or] occupational . . . functioning such as inability to keep a job." *Langley v. Barnhart*, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (alterations omitted) (See AR. 528, 688, 817, 821, 829, 1032, 1222, 1237, 1431.).

---

[9] Ms. Davis' GAF was, at times assessed above 50—for example, in August 2014 on an initial assessment for counseling, Ms. Davis' GAF was 60; and at the end of her inpatient treatment in November 2014, Ms. Davis' GAF was 57. (AR. 524, 814, 1042.) However, the overwhelming evidence of Ms. Davis' GAF indicates the lower score.

The Commissioner argues that the ALJ correctly noted that the GAF scores represent a clinician's subjective evaluation at a single point in time rather than a claimant's overall limitations in functioning and, viewed in isolation, they do not necessarily relate to the ability to hold a job. (Doc. 27 at 8.) Further, relying on *Rose v. Colvin*, 634 F. App'x 632, 636 (10th Cir. 2015), the Commissioner argues that that GAF scores have no direct correlation to disability and the current DSM discontinued the use of GAF scores due to its conceptual lack of clarity. (Doc. 27 at 8.) In *Rose*, our Tenth Circuit held that a low GAF score, standing alone, is insufficient to find that a mental impairment meets a listing. *Rose*, 635 F. App'x at 636. In support of this proposition, the *Rose* court cited Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746-01, 50,765-65 (Aug. 21, 2000), in which the Social Security Administration explained that GAF scores do "not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." Neither *Rose* nor the Federal Register publication cited therein stand for the proposition that GAF scores are obsolete, and as evidenced by subsequent authorities, the GAF score in context with other medical evidence continues to have relevance in disability determinations. *See Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017) (observing that "[a]fter the DSM-V was published, the Social Security Administration issued a directive to its ALJ's in July 2013, instructing them to still consider GAF scores as medical opinion evidence but emphasizing that GAF scores should not be considered in isolation"); *see also Arterberry v. Berryhill*, 743 F. App'x 227, 230 (10th Cir. 2018) (unpublished) (citing *Langley* for the proposition that a GAF score of 50 "indicates serious symptoms or serious impairment in occupational functioning" (alteration omitted); *Harrold v. Berryhill*, 714 F. App'x 861, 866 n.5 (10th Cir. 2017) (unpublished) (citing *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164

(10th Cir. 2012) for the proposition that "GAF scores prepared by an acceptable medical source . . . qualify as medical opinions").

While a GAF score taken alone does not establish an impairment serious enough to preclude an ability to work, *Holcomb v. Astrue*, 389 F. App'x 757, 759 (10th Cir. 2010) (unpublished), the ALJ's decision ignored substantial evidence in the record—including treatment notes taken at the time that Ms. Davis' GAF scores were assessed—that could impact the ALJ's analysis of Ms. Davis' limitations in functioning. On remand Ms. Davis' GAF scores should be considered not in isolation, but rather in the context of the entire body of relevant evidence pertaining to Ms. Davis' mental health impairments. *Sizemore*, 878 F.3d at 82; *Arterberry*, 743 F. App'x at 237 (discerning no error in the ALJ's consideration of a GAF score of 50 because the ALJ considered the score *along with the other medical evidence*).

## 2.  Remaining Issues

The Court will not address Ms. Davis' remaining claims of error because they may be impacted by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV.  Conclusion

For the reasons stated herein, Ms. Davis' Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, with Supporting Memorandum (Doc. 26) is **GRANTED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**